**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DEAN PHILLIP CARTER,
*Petitioner-Appellant*,

v.

RON DAVIS, Warden, San
Quentin State Prison,
*Respondent-Appellee.*

No. 13-99003

D.C. No.
2:06-cv-04532-RGK

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

DEAN PHILLIP CARTER,
*Petitioner-Appellant*,

v.

RON DAVIS, Warden, San
Quentin State Prison,
*Respondent-Appellee.*

No. 13-99007

D.C. No.
3:06-cv-01343-BEN-
KSC

OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted March 28, 2019
San Francisco, California

Filed December 26, 2019

Before:  Johnnie B. Rawlinson, Richard R. Clifton,
and Jay S. Bybee, Circuit Judges.

Per Curiam Opinion

## SUMMARY[*]

**Habeas Corpus / Death Penalty**

In appeals arising from Dean Phillip Carter's habeas corpus petitions challenging his convictions and death sentences in separate cases in Los Angeles and San Diego Counties, the panel (1) affirmed district court judgments in the Central and Southern Districts of California denying his petitions; (2) granted, as to one claim in the Central District, Carter's supplemental motion to expand the certificate of appealability; and (3) otherwise denied the supplemental motion to expand the certificate of appealability.

The Central District certified two claims for review: (1) that an irreconcilable conflict between Carter and trial counsel resulted in a denial of his Sixth Amendment rights, and (2) that trial counsel rendered ineffective assistance

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

because they refused to allow Carter to testify in his own defense.

•   The panel held that even if Carter were able to demonstrate a complete breakdown in communication or prove that an irreconcilable conflict with trial counsel existed under this circuit's precedent, his irreconcilable-conflict claim would fail because the U.S. Supreme Court has never held that an irreconcilable conflict with one's attorney constitutes a per se denial of the right to effective counsel. The panel explained that this proves fatal to Carter's claim because AEDPA conditions habeas relief on a determination that the state-court decision unreasonably applied "clearly established Federal law" as pronounced by the U.S. Supreme Court.

•   The panel held that the California Supreme Court reasonably determined that counsel did not perform deficiently by refusing to let Carter testify, and that even if counsel performed deficiently by refusing to do so, the California Supreme Court's determination that Carter cannot show prejudice was not an unreasonable application of law.

The Southern District certified two claims for review: (1) that Carter's trial counsel rendered ineffective assistance at the penalty phase, and (2) that Carter was deprived of his right to the competent assistance of a psychiatric expert.

•   The panel held that Carter failed to establish that the California Supreme Court was unreasonable in denying relief on his contentions that counsel performed deficiently (a) by focusing on the positive aspects of Carter's career and family life as a result, rather than

giving greater emphasis to his traumatic childhood; and (b) by failing to conduct an adequate investigation into Carter's mental health, including the possibility that he suffered from fetal alcohol syndrome.

• The panel held that Carter failed to establish that *Ake v. Oklahoma*, 470 U.S. 68 (1985), or any other U.S. Supreme Court decision would cause jurists of reason to disagree with the reasonable arguments in support of the California Supreme Court's denial of his claim that he was deprived of the right to competent assistance of a psychiatric expert at trial. The panel wrote that, as Carter conceded, the U.S. Supreme Court has never interpreted *Ake* to guarantee a due process right to effective expert assistance at trial.

The panel issued a certificate of appealability on one claim, not certified by the Central District, alleging ineffective assistance of counsel at the penalty phase. The panel affirmed the denial of relief on that claim because the California Supreme Court's determination that counsel satisfied the deferential standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), is not contrary to or an unreasonable application of federal law. The panel wrote that the California Supreme Court may reasonably have concluded that the investigation supporting counsel's decision not to introduce more mitigating evidence was reasonable, and that even if Carter's defense team performed deficiently, the California Supreme Court could reasonably have concluded that Carter was not prejudiced by their performance.

The panel denied a certificate of appealability as to the rest of the claims not certified by the Southern and Central District Courts.

---

**COUNSEL**

Michael D. Weinstein (argued) and Mark Yim, Deputy Federal Public Defenders; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Annie Featherman Fraser (argued), Deputy Attorney General; Holly D. Wilkens, Supervising Deputy Attorney General; Julie L. Garland, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, San Diego, California; for Respondent-Appellee.

---

**OPINION**

PER CURIAM:

In separate proceedings in Los Angeles and San Diego, Dean Phillip Carter (Carter) was convicted of murder, rape, robbery, and burglary and sentenced to death. Carter filed petitions for writs of habeas corpus in the United States District Courts for the Central District of California and for the Southern District of California. The district courts denied Carter's petitions.

In appeal No. 13-99003, we affirm the judgment of the Central District and deny Carter's motion to expand the certificate of appealability (COA) as to all claims except

claim 6, regarding ineffective assistance of counsel at the penalty phase.

In appeal No. 13-99007, we affirm the judgment of the Southern District and deny Carter's motion to expand the COA.

## I.  BACKGROUND

Carter stood trial in Los Angeles County and San Diego County for charges stemming from a crime spree throughout California in Spring 1984.  In the Los Angeles proceedings, Carter was accused of the rape and murder of Bonnie Guthrie and the burglary of her residence; and of the murder of Susan Knoll, rape and murder of Jillette Mills, and the burglary of their shared residence.  In San Diego County, Carter was accused of the murder and robbery of Janette Cullins and the burglary of her residence; and of the rape, forcible oral copulation, and robbery of B.S.[1] and the burglary of her residence.  In both the Los Angeles and San Diego proceedings, prosecutors also introduced evidence of Carter's prior convictions for rape, robbery, and assault of J.S. in Ventura County, and of his connection to the murder of Tok Kim in Alameda County.  The crimes occurred over four

---

[1] We identify living victims of sex crimes only by their initials in this opinion.

California counties over a period of about three weeks. We describe them briefly and chronologically.[2]

A. *The Crimes*

On March 25, 1984, Carter broke into the San Diego home of B.S. wielding a knife and demanded money. After taking B.S.'s cash, he raped her, hog-tied her, and stole her car.

On March 27, Carter raped J.S. at knifepoint in her Ventura County apartment, cut her face, strangled her twice to the point at which she lost consciousness, and stole cash from her.[3]

On April 1, Carter met Tok Kim at a bar in Lafayette, California, and offered to help her with car trouble. Over the next two days, a service station manager named David Hogan observed Carter and Kim at his station together. Hogan observed that Carter was wearing sunglasses and a black "Members Only" style jacket. On the night of April 10, Kim's neighbor heard Kim arguing in her Oakland apartment with an unidentified man who was not her boyfriend. Kim's co-workers notified her apartment manager after Kim did not appear for work on two consecutive days. On April 13, the

---

[2] The facts set forth in this opinion are taken directly from the most recent reasoned state-court decisions issued in the challenged proceedings: *People v. Carter*, 117 P.3d 476 (Cal. 2005) (Los Angeles) and *People v. Carter*, 117 P.3d 544 (Cal. 2005) (San Diego).

[3] A Ventura County jury convicted Carter of the rape, robbery, and assault of J.S. He does not seek relief from these convictions here. However, prosecutors introduced evidence of these convictions in both of Carter's death penalty trials.

apartment manager found Kim's body on her bedroom floor. The pathologist who performed the autopsy could not determine the cause of death because of the body's advanced stage of decomposition but testified that a curtain tie found beneath her neck could have been used to strangle her.[4]

On April 11, Culver City, California resident Susan Knoll went absent from her job at a bank. Knoll's co-worker took a call from an unidentified man who informed her that Knoll had been in a traffic accident and was being treated for minor injuries at a hospital. The same day, after Knoll's roommate Jillette Mills failed to respond to her brother's attempts to contact her, the brother and a friend searched for Mills at her apartment, place of employment, and college but were unable to find Mills or her car. The two men then climbed a fence to enter Mills's and Knoll's unlocked apartment and found the bodies of both women stacked in the closet.

Investigators discovered Kim's vehicle outside of Mills's and Knoll's apartment. Inside the vehicle was a pair of sunglasses, which Hogan identified as matching a pair he observed Carter wearing at his station while with Kim. Mills's white Datsun was missing. Inside the apartment, investigators retrieved a palm print matching Carter's from the bathroom sink. An autopsy determined that Knoll died of manual strangulation and Mills died of ligature strangulation. Both women also suffered injuries consistent with having struggled against an assailant and had seminal fluid on their genital areas. Mills additionally suffered injuries to her genital area consistent with traumatic sexual assault.

---

[4] Carter has never faced charges relating to Kim's death. Prosecutors introduced evidence of the circumstances surrounding her death, however, in both of Carter's death penalty trials.

Also on April 11, the manager of Bonnie Guthrie's apartment building in Los Angeles entered Guthrie's apartment with a repairman. Guthrie was Knoll's best friend. The manager observed Guthrie lying on her bedroom floor and remarked to the repairman that she was sleeping. The next day, the manager noticed Guthrie's vehicle in the garage and wondered why she had not gone to work. He entered the apartment, observed Guthrie lying in the same position, and notified police. An autopsy determined that Guthrie died of ligature strangulation and that she had suffered injuries to her genital area consistent with traumatic sexual assault. Two days after the discovery of Guthrie's body, a witness found Guthrie's wallet in a San Diego shipyard, approximately fifty feet from a white Datsun matching the description of Mills's missing vehicle.

On April 12, Carter visited the San Diego apartment of Janette Cullins and her roommate Cheri Phinney. Carter and Cullins knew one another socially, and had met for drinks and dinner with other friends on two occasions in February and March 1984. On March 24, Carter had attempted to contact Cullins through her friend Cathleen Tiner. When Tiner told Cullins that Carter had called for her, Cullins became upset. Cullins had also told her former roommate, Nancy McEachern, that if Carter called for her she did not want to speak with him. When Carter visited Cullins on April 12, Cullins asked Phinney to come through the living room so that Carter would be aware that someone else was in the apartment. Carter left the apartment after an hour.

That evening, Cullins and Tiner attended the symphony together. Cullins informed Tiner that Carter was back in town. At 11:00 p.m., Cullins left Tiner's apartment and was never seen alive again. Between 11:15 and 11:30 p.m.,

Cullins's neighbor observed a white Datsun matching the description of Mills's missing vehicle outside of Cullins's apartment. The neighbor observed the vehicle drive away at 11:30, nearly hitting another vehicle while making a U-turn and running through a stop sign.

On April 13, Phinney and McEachern each attempted to contact Cullins without success. At midday, McEachern drove to Cullins's apartment and encountered Carter, who was driving a white Datsun. Carter asked McEachern if Cullins was home. That evening, Carter unexpectedly visited Tiner at her home and commented that Cullins had "stood [him] up" that day. Tiner then unsuccessfully attempted to contact Cullins.

The following day, Phinney and McEachern searched Cullins's apartment and found her partially clothed body in her bedroom closet. A police investigation found damage to the front door consistent with a forced entry. An autopsy determined that Cullins died of ligature strangulation and that she had sustained a wound consistent with the use of a sharp knife either while she was dying or after she had died.

On the same day Cullins's body was discovered, a pedestrian found a wallet containing Cullins's driver's license and credit cards in bushes next to a sidewalk on North Harbor Drive in San Diego. The pedestrian testified that he had seen a white Datsun matching the description of Mills's missing vehicle parked within one block of where he had found the wallet during the same week. Later that day, police recovered Guthrie's purse from the same area of North Harbor Drive.

On April 17, an Arizona Highway Patrol officer observed Mills's white Datsun driving erratically on Interstate 40 in

Yavapai County, Arizona. The officer initiated a traffic stop and discovered Carter alone in the vehicle with what appeared to be a burnt marijuana cigarette and placed Carter under arrest on suspicion of driving under the influence. While searching the vehicle for marijuana, the officer discovered Cullins's bank identification card between the driver's seat and center console.

A full search of the vehicle recovered the following items: a suitcase, Korean-made wood-handled knife, yellow rubber gloves, and a gold chain, all belonging to Kim; a supermarket card belonging to Knoll; towels, athletic wear, and photographic equipment, all belonging to Mills; three hand-woven sweaters belonging to Guthrie; a key ring belonging to Cullins; a piece of paper with Cullins's bank password written on it; and a black "Members Only" jacket matching the description of the jacket Hogan had seen Carter wearing while with Kim. The jacket contained a butcher knife, a knee-high nylon sock, and a business card from Hogan's service station.

Bank records revealed that all but $4.06 of Cullins's bank account balance had been withdrawn from an ATM on April 13, the day after she was last seen alive. A video of the transaction showed a man wearing one of Guthrie's sweaters and a black jacket withdrawing the funds. A handwriting expert testified that there were "very strong indications" that Cullins had written the password on the slip of paper recovered from the Datsun but also could neither eliminate nor identify Carter as the writer.

B.  *Criminal Proceedings*

1.  Los Angeles County

The Los Angeles trial regarding the crimes against Knoll, Mills, and Guthrie was bifurcated into guilt and penalty proceedings.  At the guilt phase, Carter's counsel rested without calling any witnesses or putting on a defense.  Carter was convicted on all counts.  At the penalty phase, Carter's counsel presented an extensive mitigation case detailed below.  Carter was sentenced to death.

2.  San Diego County

The San Diego trial, which followed his conviction in Los Angeles County, was also bifurcated into guilt and penalty proceedings regarding the murder of Cullins and the rape of B.S.  Carter stipulated before trial that he had been convicted of the murders of Knoll, Mills, and Guthrie.

At the guilt phase, counsel put on a defense by calling several witnesses.  But the jury found Carter guilty of the murder of Cullins, and found true the special circumstances that the murder was committed while lying in wait, during the commission of both a robbery and a burglary, and that Carter had previously been convicted of the murders of Knoll, Mills, and Guthrie.  It further found Carter guilty of the robbery of Cullins and the burglary of her residence and found that he had inflicted great bodily injury during the course of these crimes.  The jury also found Carter guilty of the forcible rape, forcible oral copulation, and robbery of B.S. and the burglary of her residence, and determined that Carter had used a deadly weapon (a knife) in the commission of each of his crimes against B.S.

At the penalty phase, counsel presented a mitigation case similar to that presented in the Los Angeles trial. The jury returned a recommendation of the death penalty. The court imposed a death sentence.

## C. *California Supreme Court Proceedings*

Carter's convictions and sentences were appealed to the California Supreme Court. While those appeals were pending, Carter filed his first round of state habeas petitions in that court. In 2005, the California Supreme Court affirmed the convictions and death sentences in two separate, reasoned opinions. *People v. Carter*, 117 P.3d 476 (Cal. 2005) (Los Angeles); *People v. Carter*, 117 P.3d 544 (Cal. 2005) (San Diego). The court affirmed both judgments in their entirety with the exception of the San Diego court's finding of the special circumstance of lying in wait on the Cullins murder charge, which it set aside. Carter sought review of these decisions in the Supreme Court of the United States, which denied his petitions for writ of certiorari in 2006. *Carter v. California*, 547 U.S. 1099 (2006) (mem.) (Los Angeles); *Carter v. California*, 547 U.S. 1043 (2006) (mem.) (San Diego).

In 2006, the California Supreme Court summarily denied Carter's habeas petitions on the merits. Carter filed two subsequent rounds of state habeas petitions in 2007 and 2010. The California Supreme Court summarily denied each of those petitions on the merits in 2010.

## D. *Federal Habeas Proceedings*

Carter initiated the instant proceedings in 2007. In a petition for writ of habeas corpus filed in the United States

District Court for the Southern District of California, he asserted seventeen claims for relief related to his San Diego County trial. Two days later, he filed a petition for writ of habeas corpus in the United States District Court for the Central District of California, asserting seventeen additional claims for relief related to his Los Angeles County trial. Carter filed amended petitions in both federal district courts in 2010, reducing the number of claims in his Southern District petition to sixteen.

In 2013, the Central District of California published a 146-page order dismissing two of Carter's claims without prejudice and denying the rest of his claims on the merits. The district court granted a COA on two of Carter's claims: that an irreconcilable conflict between Carter and trial counsel resulted in a denial of his Sixth Amendment rights (Certified Claim 1, and Claim 1 of the First Amended Petition); and that trial counsel rendered ineffective assistance because they refused to allow Carter to testify in his own defense (Certified Claim 2, and Claim 5(D) of the First Amended Petition). It denied a COA on the remaining claims.

Later in 2013, the Southern District of California published a 318-page order denying all claims on the merits. The district court granted a COA on two claims: that trial counsel had rendered ineffective assistance during the penalty phase (Certified Claim 1, and Claim 3 of the Second Amended Petition); and that Carter was deprived of his right to the competent assistance of a psychiatric expert (Certified Claim 2, and Claim 4 of the Second Amended Petition). It denied a COA on the remaining claims. Carter filed a motion under Federal Rule of Civil Procedure 59(e) or 60(b) to vacate the order denying his petition and allow him to return

to state court to further develop the evidentiary record.  The Southern District denied this motion in a reasoned decision.

Carter timely appealed both district court orders.

## II.  STANDARD OF REVIEW

"We review the district court[s'] denial of a habeas petition de novo." *Jones v. Harrington*, 829 F.3d 1128, 1135 (9th Cir. 2016).  Carter's habeas petitions are subject to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which forecloses federal habeas relief for "any claim that was adjudicated on the merits in State court" unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

These standards are "intentionally 'difficult to meet.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)). "'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only 'the holdings'" of Supreme Court decisions; it does not include Supreme Court dicta or circuit precedent. *Woodall*, 572 U.S. at 419–20 & n.2; *see Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) (per curiam).  A state-court decision is "contrary to" clearly established Supreme Court precedent "if it 'applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'"  *Price v. Vincent*, 538 U.S.

634, 640 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). A state-court decision "involve[s] an unreasonable application" of clearly established Supreme Court precedent if "it correctly identifies the governing legal rule" but then applies that rule to the facts of a particular case in an "objectively unreasonable" way, such that the state court's ruling rested on "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woodall*, 572 U.S. at 421, 426–27 (citations omitted). Finally, a state-court decision is "based on an unreasonable determination of the facts" if "we are convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Murray v. Schriro*, 745 F.3d 984, 999 (9th Cir. 2014) (citation and internal alteration omitted).

These deferential standards apply to each claim adjudicated on the merits in state court, regardless of whether the state court disposed of the claim in a reasoned opinion or a summary ruling. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). We generally "look to the last reasoned state court decision to address the claim" on the merits. *White v. Ryan*, 895 F.3d 641, 665 (9th Cir. 2018) (citing *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018)). If there is no reasoned state-court decision, we must "determine what arguments or theories . . . could have supported[] the state court's decision." *Richter*, 562 U.S. at 102.

Finally, even if a habeas petitioner satisfies one of the § 2254(d) prongs for relief, he must show that the claimed trial error "resulted in 'actual prejudice.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). "Under this test, relief is proper

only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 2197–98 (internal quotation marks omitted).

## III. CERTIFIED CLAIMS

We begin with the claims certified by the district courts. For three of the four claims, the "clearly established Federal law," 28 U.S.C. § 2254(d)(1), is the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), which held that the Sixth Amendment guarantees a criminal defendant the "right to the effective assistance of counsel" at both the guilt and penalty phases of a capital trial. *Id.* at 685–87. Under *Strickland*, a defendant claiming denial of effective assistance of counsel "bears the burden to meet two standards." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017).

First, the defendant "must show deficient performance—that the attorney's error was 'so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). Under *Strickland*, our inquiry is highly deferential, and we "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689). "To overcome that presumption, a defendant must show that counsel failed to act 'reasonably considering all the circumstances.'" *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (alteration omitted) (quoting *Strickland*, 466 U.S. at 688). The relevant inquiry is "whether an attorney's representation amounted to incompetence under 'prevailing

professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). And given the "temp[tation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," the Supreme Court has strongly cautioned us against drawing the conclusion "that a particular act or omission of counsel was unreasonable" just because it "proved unsuccessful." *Strickland*, 466 U.S. at 689.

Second, the defendant must "demonstrate prejudice—'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Buck v. Davis*, 137 S. Ct. 759, 776 (2017) (quoting *Strickland*, 466 U.S. at 694). In the context of a death sentence, "[t]he question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Pinholster*, 563 U.S. at 198 (alteration omitted) (quoting *Strickland*, 466 U.S. at 695).

"Surmounting *Strickland*'s high bar is never an easy task," and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105 (citations omitted). Our review under AEDPA is "doubly deferential," as we must "afford 'both the state court and the defense attorney the benefit of the doubt.'" *Donald*, 135 S. Ct. at 1376 (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)).

A.  *Claims Certified by the Central District: Claims 1 and 5(D)(1), Carter's Conflict with Counsel*

The Central District issued a COA for two largely overlapping claims, which it addressed together.  The certified claims effectively present two questions on appeal: whether the California Supreme Court's decisions that (1) Carter was not denied his Sixth Amendment right to counsel because of an "irreconcilable conflict" with his trial counsel and (2) counsel's performance in refusing to let Carter testify was not deficient, and even if it was, Carter was not prejudiced, were contrary to or an unreasonable application of clearly established federal law.  For the reasons stated below, we hold that the California Supreme Court did not violate clearly established federal law in denying Carter relief.

1.  Carter's Attorneys and the *Marsden* Hearings

Ezekiel Perlo was initially appointed lead counsel and represented Carter, along with Marcia Morrisey, for over two years during 1986–1988.  About a year prior to trial, in March 1988, the court appointed Rowan Klein to assist Carter in his motion to substitute counsel, which under California law is referred to as a *Marsden* motion.  *See People v. Marsden*, 465 P.2d 44 (Cal. 1970).  The trial court held a *Marsden* hearing in which Klein notified the court that conflicts between Perlo and Carter had "led to a total breakdown of the attorney-client relationship" and that Carter wanted a new attorney to be appointed in place of Perlo.  The trial court was troubled by this "easily made," "blanket statement" that would further delay a trial already "long overdue."  It nevertheless agreed that the conflict between Perlo and Carter did not give it "much choice" but to grant the motion.  The

court appointed Howard Gillingham lead counsel a week later, and he and Morrissey represented Carter throughout the duration of the trial.

### a.  July 5 (First *Marsden* Hearing)

On July 5, 1989, just after the prosecution rested during the guilt phase, Gillingham requested an *ex parte* hearing to apprise the trial court of a disagreement between him and Carter.  Gillingham invoked *Marsden* in requesting the hearing but did not say anything that would suggest Carter had requested new counsel.  Gillingham stated he wanted to "spread something on the record regarding the defense strategy and position."  He informed the court that it was his and Morrissey's "firm belief that [they] should rest" and not put on a defense at the guilt stage.  He noted that there were a number of potential witnesses he could call but that they made the "tactical decision not to call those witnesses."  He did not mention Carter as one of those witnesses. Gillingham acknowledged Carter emphatically disagreed with the decision not to call any witnesses and that Carter wanted the disagreement preserved in the record. Gillingham argued that this was a situation where the appointed lawyers "should call the shots."  The trial court agreed, noting "the record is clear" and that "in these matters the decisions should be with the counsel."   Carter did not speak during the hearing and Gillingham subsequently testified that, based on his belief that the "lawyer ought to do the talking," he had instructed Carter not to speak unless the court directly addressed him.

### b.  July 10 (Second *Marsden* Hearing)

Carter later testified that after the first *Marsden* hearing, he complained to Gillingham for leaving out "a couple of

things," including telling the court about his desire to testify, and for not "ma[king] it as clear as [Carter] would have liked." Thus, on July 10, after both parties had rested but prior to closing arguments, Gillingham requested another hearing, which he noted "probably should be done in a sealed basis again under *People versus Marsden*." The hearing was brief and Gillingham stated:

> Your honor, one further thing, in all modesty, I think I neglected to do it the other day, and, that is, in addition, by not putting on the witnesses, it also precluded the potential of Mr. Carter testifying based on . . . what those witnesses would have testified to and the effect of their testimony.

The court responded: "You just wanted to add that?" Gillingham said he had nothing further and the court ordered the exchange sealed.

That same day, after closing arguments, the court held another *ex parte* hearing, which did not appear to invoke *Marsden*. It was also very brief and Gillingham added:

> Your Honor, Mr. Carter asked me to spread upon the record that he does not agree with the closing argument that counsel made, that he had asked me what it was, and that he was not informed of the type of argument. And he certainly does not feel that it was adequate, and this just compounds the problem of the lack of defense by the argument that counsel made.

The court responded by noting the "record is clear" and again sealed the record. Carter did not speak during either of these exchanges.

### c.  July 17 (Third *Marsden* Hearing)

On July 17, while the jury was deliberating, Gillingham again requested a hearing "under the ambit of *Marsden*." Gillingham informed the court:

> Mr. Carter continues to express disappointment . . . [with] the manner in which to this point the case has been handled by counsel. He specifically would ask me to, as I understand it, ask you to appoint Mr. Rowen Klein . . . [to] prepare and file a new trial motion or some motion pre-penalty phase. This is part of the reason for the *Marsden*.
>
> I will say that counsel opposes that motion. . . . We have discussed Mr. Carter's now constitutional rights under the ultimately famous case of *Feretta*. . . . He is not making that request today.

The court denied the request as untimely and noted that while Klein may ultimately be able to help Carter file a motion for new trial, it was not the appropriate time to consider such a motion.

d.   September 5 (Fourth *Marsden* Hearing)

On September 5, after the jury returned a death verdict but prior to sentencing, Gillingham once again requested an *ex parte* hearing under *Marsden*.  The following colloquy took place:

> Gillingham:   Your Honor, as you know, throughout the case there have been various instances where Mr. Carter's feelings, opinions, *et cetera*, as to how the case was being run surfaced.  That has happened again, and my own personal opinion, for what it's worth, is, it's probably well taken.  We asked to be here under *People versus Marsden*, and it's my impression and belief that Mr. Carter does not have confidence in the ability of Miss Morrissey to proceed with his defense.  This is not a knee jerk reaction.  We've discussed it.
>
> Court:  So without your opinion on the merits of his displeasure, you feel there are righteous differences of opinion here?
>
> Gillingham:  Yes, I do, your honor.
>
> Court:  And possibly is.  You would be unable ethically or intellectually to pursue the types of claims that Mr. Carter would be making on a motion for new trial and other issues?
>
> Gillingham:   Absolutely, and I do feel strongly about it, that assuming new counsel

were available, the most expeditious judicial and most fair way to proceed, Miss Morrissey and I should be relieved.  That is Mr. Carter's request, which I understand it is.

. . .

Court:  And Mr. Carter, is that your desire to have Mr. Klein appointed to represent you in this proceedings from now on?

Carter:  Yes, it is.

Court:    And do you agree with Mr. Gillingham's statement that there is a difference–

Carter:  Definitely.

Court:  I don't really see I have much choice in this matter.  At this point I don't want to pry, and I certainly respect the tremendous amount, not only Mr. Gillingham and Miss Morrissey's legal abilities, but their ethical standards as well, a[nd] if they feel that this is the correct thing to do, I certainly would agree.

The trial court then appointed Klein to represent Carter on his motion for a new trial.

e.  Hearing on Motion for a New Trial

Klein moved for a new trial based, in part, on the conflict between Gillingham and Carter.  The court held a hearing on the motion and Gillingham was called to testify about his representation.  Gillingham testified that he and Morrissey recognized it was a "potential death case" and that they had made the "tentative decision" to try it as a penalty case. He admitted that the cases pending in Oakland and San Diego "had to be some factor" in that decision.  As an example of how this decision affected the trial strategy, Gillingham noted that "the voir dire of the jurors was almost entirely death focused."  Gillingham testified that Carter "wanted to put on at all times a full-blown defense" and "contest [] guilt" which included the "possibility" of Carter testifying.  Gillingham observed that Carter's comments were at times "framed in the negative," such as:  "Aren't you going to do something?"; "Where are the witnesses?"; and "What are you going to do?" Gillingham further testified that in each of the hearings discussed above he had always intended to accurately convey Carter's desires but that he likely did not do so very well.

Carter also testified during the hearing on the motion for new trial.  Carter said he told his attorneys he "wanted to present a defense" and that he "was more concerned about the guilt phase and that [he] felt it was necessary for [him] to testify."  They did not settle on a defense strategy before trial because Gillingham told him they could not fully plan their strategy until they saw the prosecution's case.  He said the first serious discussion with his counsel about the defense case, including him testifying, was the day before the prosecution rested.  At that time, Gillingham told him that he was not planning on putting on a defense, and if they were not going to put on a defense, Carter would not testify.  Carter

was "upset," and told Gillingham that he "wanted to call witnesses, put on a defense and testify." Carter noted he had discussed trial strategy with Gillingham "around" ten times prior to trial.

One time after voicing his disagreement to Gillingham, Carter stated that Gillingham responded by telling him, "[a]s hard as it is sometimes a lawyer has to play god." Carter testified he was particularly upset that he would not be able to testify as a result of Gillingham's decision not to call witnesses and that he had requested the *Marsden* hearings to "indicate to the court that I was not happy with what [Gillingham] was doing and I wanted to make sure it was clear that it was over my objection that he was doing it." On cross-examination, Carter conceded that he had not thought about how his decision to testify could affect the other pending cases. And when asked whether Gillingham stated Carter's view "completely and accurately," Carter responded, "As far as I recall."

Klein argued that as soon as the court learned Carter wanted to testify, it was constitutionally obligated to seek a waiver of Carter's right to testify. The court orally denied the motion for a new trial without expressing its reasoning.

### f.   California Supreme Court Proceedings

On direct appeal to the California Supreme Court, Carter argued the trial court erred by failing to adequately inquire into the conflict with his counsel and by failing to appoint new counsel once the conflict was disclosed. *Carter*, 117 P.3d at 530. The California Supreme Court denied this claim on its merits. *Id.* at 530–34. It rejected Carter's claim

that his conflict with Gillingham denied Carter his right to conflict-free, effective representation and held:

> Here, the record supports the People's position that defendant, a person with a sophisticated view of the criminal justice system from the inside, complained sufficiently during proceedings conducted in the trial court so as to create a colorable appellate issue, but not sufficiently to obligate the trial court to relieve his counsel.

*Id.* at 532–33 (internal quotation marks omitted). The court agreed with the prosecutor who argued the motion for a new trial that "Mr. Carter was a defendant who wanted things his way. . . . Mr. Gillingham did not do them his way for valid legally sufficient reasons, and Mr. Gillingham indicated this . . . displeasure of Mr. Carter, but in the end, Mr. Carter acceded to Mr. Gillingham's trial strategy." *Id.* at 533 n.40 (second alteration in original).

The court also denied Carter's claim that the trial court failed to sufficiently inquire into the conflict, concluding:

> [W]e are satisfied from the record before us that in the course of conducting three *Marsden* hearings, the trial court adequately inquired as to the issues raised by the defense, and that counsel fairly characterized the nature of the conflict for the trial court. . . .
>
> [D]efendant fails to persuade us that his conflict with defense counsel over trial tactics and strategy (including the decision whether

defendant should testify), the trial court's inquiries into that conflict, or the court's refusal to appoint new counsel prior to the conclusion of the penalty phase, either singularly or in the aggregate, deprived defendant of his state or federal constitutional rights.

*Id.* at 534.

### 2.  Irreconcilable Conflict

In his federal habeas petition, Carter argued he was denied his constitutional right to "conflict-free, effective counsel" because of "an irreconcilable conflict with his court-appointed attorneys" and that the California Supreme Court's opinion to the contrary was an "unreasonable application" of clearly established federal law and "based on an unreasonable determination of the facts."

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel at all critical stages of the proceeding. *Coleman v. Alabama*, 399 U.S. 1, 7 (1970). It ensures defendants "an effective advocate," but does not guarantee the defendant "will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988).

We have stated that "to compel one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever." *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970); *see Stenson v. Lambert*,

504 F.3d 873, 886 (9th Cir. 2007). Concluding that such conflicts are tantamount to a denial of counsel altogether, we have held a defendant "need not show prejudice" as would ordinarily be required under a claim of ineffective assistance of counsel. *United States v. Moore*, 159 F.3d 1154, 1158 (9th Cir. 1998); *see also id.* ("[I]f the relationship between lawyer and client completely collapses, the refusal to substitute new counsel violates [defendant's] Sixth Amendment right to effective assistance of counsel."). Carter argues that if he can establish an "irreconcilable conflict" existed between him and Gillingham under the three-step inquiry we set forth in *Moore*, he need not demonstrate the conflict prejudiced his defense. *See* 159 F.3d at 1158–59.[5]

Even under our circuit's precedent, the conclusion that an irreconcilable conflict did not exist based on the disagreement between Carter and Gillingham was reasonable. *Carter*, 117 P.3d at 533. "[O]nly where there is a complete breakdown in communication," have we recognized an irreconcilable conflict claim. *Stenson*, 504 F.3d at 886. At the hearing on the motion for a new trial, both Carter and Gillingham testified that they spoke many times before and throughout the trial about tactical decisions. The evidence simply does not demonstrate "a total lack of communication" between Carter and Gillingam. *Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000). Moreover, "[d]isagreements over strategical or tactical decision do not rise to level [sic] of a

---

[5] We fashioned a three-part test in *Moore* to determine whether a conflict rises to the level of "irreconcilable." *See Moore*, 159 F.3d at 1158–59. Specifically, we consider "(1) the extent of the conflict; (2) the adequacy of the inquiry [by the trial court]; and (3) the timeliness of the motion [for substitution of counsel]." *Id.*

complete breakdown in communication." *Stenson*, 504 F.3d at 886 (citing *Schell*, 218 F.3d at 1026).

Even if Carter were successfully able to demonstrate a complete breakdown in communication or prove that an irreconcilable conflict existed under the *Moore* factors, Carter's irreconcilable-conflict claim would still fail. This is because the Supreme Court has never endorsed this line of precedent from our court. It has never held that an irreconcilable conflict with one's attorney constitutes a per se denial of the right to effective counsel. This proves fatal to Carter's claim because AEDPA conditions habeas relief on a determination that the state-court decision unreasonably applied "clearly established Federal law" as pronounced by the U.S. Supreme Court. 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 365. Although we may look to our circuit's precedent to see if we have already held a rule is clearly established, our decisions may not "be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam); *see Parker*, 567 U.S. at 49 (holding the Sixth Circuit erred in applying its circuit's "multistep test" that bore scant resemblance to the general rules announced by the Supreme Court). Carter does not cite to any Supreme Court case holding that an irreconcilable conflict between a lawyer and his client constitutes a constructive denial of his right to counsel, with no showing of prejudice required. Nor has he pointed to Supreme Court precedent that resembles our test in *Moore*.

The Supreme Court cases Carter cites are inapposite, as they all deal with conflicts of interest between other clients the counsel represented. *See Wheat*, 486 U.S. at 163–64 (holding in multiple-representation cases, a district court must help protect criminal defendants against counsel's conflict of interest); *Wood v. Georgia*, 450 U.S. 261, 271–72 (1981) (discussing potential conflicts arising from counsel hired by defendants' employer); *Holloway v. Arkansas*, 435 U.S. 475, 482 (1978) (holding joint representation of codefendants is not per se unconstitutional). The type of conflict Carter has alleged, however, is one over defense strategy. The term "conflict" can refer to different forms of conflict, and care must be taken not to mix them up. We have expressly declined to extend the conflict-of-interest analysis in *Wheat*, *Wood*, and *Holloway* to the type of conflict Carter alleges. We rejected arguments similar to Carter's in another capital habeas case:

> [Petitioner's] disagreement with [his counsel] is better characterized as one over trial strategy . . . . We can find no clearly established Supreme Court precedent holding that this kind of disagreement amounts to an actual conflict of interest. The Washington Supreme Court correctly determined that no clearly established federal law supports [Petitioner's] construction of "conflict of interest" as describing a disagreement between attorney and client over trial strategy.

*Stenson*, 504 F.3d at 886.**[6]**   We are "not aware" of any Supreme Court case suggesting the Sixth Amendment is violated because the defendant "dislike[s] or distrust[s]" his counsel. *Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008); *see also Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008).

Carter similarly fails to cite to any Supreme Court precedent establishing that a trial court's failure to inquire into the nature of the attorney-client relationship is a per se violation of a defendant's Sixth Amendment rights.  Carter admits that the Supreme Court cases he relies on "do not explicitly hold that a trial court must ask the defense attorney and defendant about a conflict" but contends that the "requirement is implicit in the holdings."  AEDPA requires more than pointing to implicit holdings or dicta; it requires that the law be clearly established. *Williams*, 529 U.S. at 412.

In arguing the California Supreme Court's opinion contains an unreasonable determination of the facts, Carter mischaracterizes the opinion as holding there was no conflict between Carter and Gillingham.   The court, however, recognized the conflict and accurately described it as

---

**[6]** Admittedly, we relied on our own precedent in *Stenson*, as Carter urges this panel to do, but that decision was rendered before the Supreme Court's more recent admonitions against relying on circuit precedent. That opinion involved a habeas petition in a capital case where the court held that an "irreconcilable conflict" with counsel was a constructive denial of the Sixth Amendment right to effective counsel.  Significantly, our opinion in that case did not hold that the right to "conflict-free" counsel, as Carter uses that term, was clearly established by any Supreme Court case law.  Rather, it simply analyzed the claim under the *Moore* test without citing any similar Supreme Court case. *See Stenson*, 504 F.3d at 886–88.

"dissatisfaction with counsel's trial strategy and tactics." *Carter*, 117 P.3d at 534.

In sum, Carter's attempt to avoid the Supreme Court's established framework for ineffective-assistance-of-counsel claims by looking to this circuit's articulation of the right to effective counsel is unavailing and we review Carter's claim under *Strickland*, which is the clearly established federal law for claims alleging ineffective assistance of counsel, as determined by the Supreme Court. *See Ayala v. Chappell*, 829 F.3d 1081, 1096 (9th Cir. 2016).

### 3. Ineffective Assistance of Counsel by Refusing to Let Carter Testify

#### a. Prior Rulings

As described above, during the first *Marsden* hearing, Gillingham told the court he and Morrissey "firm[ly] belie[ved] that [they] should rest" and not put on a defense at the guilt stage. He explained they made the "tactical decision not to call [potential] witnesses," despite Carter's disagreement. The trial court agreed with Gillingham that "in these matters the decisions should be with the counsel." During the second *Marsden* hearing, Gillingham clarified that "by not putting on the witnesses, it also precluded the potential of Mr. Carter testifying."

The California Supreme Court determined that Carter "had ample opportunity during the course of [these] *Marsden* hearings to inform the court that he wished to testify, against the advice and over the objection of defense counsel, *even if defense counsel were permitted to decline to present any other defense witnesses who would support defendant's own*

*testimony*," but he did not.  *Carter*, 117 P.3d at 533 (emphasis in original).   The court reasoned that since Gillingham repeatedly informed the court of conflicts that arose with Carter, it could assume that if Carter "told his counsel that [he] insisted upon testifying despite the absence of any other defense witnesses, his counsel would have conveyed that demand to the trial court."  *Id.*   Since there was no such evidence, the court concluded that "on this record we may not assume that defendant in fact had insisted upon testifying even where no other defense witnesses would be presented to support his testimony."  *Id.* at 533–34.   "[I]n the end," the court found, "Mr. Carter acceded to Mr. Gillingham's trial strategy."  *Id.* at 533 n.40.

The district court agreed that Carter never insisted on testifying even if no other defense witnesses would be presented.  It found that:  the California Supreme Court's determination that Carter "acceded through his conduct to Gillingham's trial strategy, as a factual matter, was not unreasonable" in light of the facts that "[a] defendant is 'presumed to assent to his attorney's tactical decision not to have him testify,'" *United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir. 1999) (quoting *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)); Carter's and Gillingham's testimony that Carter wanted to put on a full-blown defense and testify after the presentation of defense witnesses was consistent; and Carter failed to move for new counsel when Gillingham intended to rest.

### b.  Performance

Carter argues that it was deficient performance not to allow him to testify because (1) doing so against Carter's wishes conflicted with an objective standard of

reasonableness under prevailing professional norms, and (2) Gillingham did not have an informed basis for making the decision, as he did not go over "in detail" what Carter's testimony might be. We conclude the California Supreme Court reasonably determined that counsel did not perform deficiently. *See Carter*, 117 P.3d at 526.

As to professional norms, Carter argues that at the time of trial, the Supreme Court had established that a criminal defendant has a fundamental constitutional right to testify in his own defense, citing *Rock v. Arkansas*, 483 U.S. 44, 49, 51, 53 (1987). But the California Supreme Court did not conclude that Carter lacked a right to testify in his own defense if he had asserted that right. Indeed, it expressly acknowledged that "[a]lthough tactical decisions at trial are generally counsel's responsibility, the decision whether to testify, a question of fundamental importance, is made by the defendant after consultation with counsel." *Carter*, 117 P.3d at 533. Rather, the court concluded that although Carter repeatedly told counsel that he preferred to call witnesses (including himself) and present a defense case, he never insisted that he wanted to testify even if counsel made the tactical choice not to call witnesses—"in the end, Mr. Carter acceded to Mr. Gillingham's trial strategy." *Id.* at 533 & n.40. This was not an unreasonable determination of fact.

Carter argues that it was, in part, because he was unable to speak during the *Marsden* hearings because Gillingham told him not to. He also complains that the court did not ask him about whether he wanted his attorneys to present a defense or to testify. However, the transcripts reveal that Carter at least felt comfortable talking to Gillingham during these hearings to urge him to add things to his presentations at these hearings. When the court asked Gillingham at the

first *Marsden* hearing whether there was anything further, Gillingham initially replied there was not, but then said "[w]hoops, just a moment" while Carter told him about other possible witnesses, which Gillingham immediately relayed to the court.

Moreover, Carter's own descriptions of what he told Gillingham included *both* his desire to present a defense by calling other witnesses and his desire to testify himself: he "wanted to call witnesses, put on a defense and testify;" he "wanted them to subpoena the witnesses [he] wanted to call, and . . . to put on a defense; and [he] wanted to testify," he was "unhappy" because he "wanted to present a defense and [he] wanted to testify." Similarly, Carter stated he was dissatisfied with Gillingham's presentation to the court in the first *Marsden* hearing because he thought Gillingham "left out a couple of things" by not "mention[ing] all the witnesses that [Carter] wanted to call, and he also didn't tell the court that [Carter] wanted to testify on [his] own behalf." Additionally, Carter conceded that as far as he could recall, Gillingham accurately conveyed his objections. This lends further support to the California Supreme Court's finding that "Mr. Carter acceded to Mr. Gillingham's trial strategy." *Id.* at 533 n.40. And Carter points to no Supreme Court case establishing that a client has a right to testify under these circumstances.

Carter's argument that counsel did not have an informed basis for making the decision not to present a defense because he did not go over "in detail" what Carter's testimony might be also fails. The California Supreme Court could reasonably have determined that counsel's decision to focus on the penalty phase in the hope that the jury would spare Carter's life was a reasonable tactical decision, made after discussions

with Carter about what he would say if he testified. Such a decision is not altogether uncommon in capital trials, especially where the attorney believes the defendant's guilt is clear, the evidence overwhelming, and the crime heinous. *Florida v. Nixon*, 543 U.S. 175, 190–91 (2004). Counsel explained to Carter that their decision not to present a defense, including to not have Carter testify, was this sort of "tactical decision."

### c. Prejudice

Even if counsel performed deficiently by refusing to let Carter testify, the California Supreme Court's determination that Carter cannot show prejudice was not an unreasonable application of law. *See Carter*, 117 P.3d at 526. Carter argues that there is a reasonable probability the result would have been different if he had testified because (1) he would have explained the strongest evidence against him, and (2) he would have created a reasonable doubt that he had the required level of intent for first-degree murder. We disagree.

Carter never describes what explanation he would have given for driving a car belonging to one of the victims at the time he was arrested or for having the belongings of several of the victims in the car. Carter admits that his possession of those belongings was "[p]erhaps the strongest evidence against" him, without indicating how he might have explained that away. Nor does he explain how he would have undercut the physical evidence connecting Carter to the crime scenes—the palm print and semen. We cannot conceive of an explanation which would have created a reasonable probability that he would not have been found guilty. *Strickland*, 466 U.S. at 694.

Carter also contends he would have testified that he "effectively 'blacked out' during each of the crimes," and thus "been able to successfully assert a 'diminished actuality' defense." But such testimony would necessarily have admitted guilt and thus undercut any innocent explanation for having the victims' belongings in his car.

Moreover, even if Carter testified, there is no reasonable probability—one sufficient to undermine confidence in the outcome, *Strickland*, 466 U.S. at 694—that the jury would have found him not guilty. To begin, the jury heard this type of evidence and still convicted him. For example, the jury heard that Carter told a store employee while he was with Tok Kim, "I don't even know what I'm doing here, I don't even know her." *Carter*, 117 P.3d at 486.

Similarly, there was so much evidence that Carter possessed sufficient mental capacity and intent to commit the crimes that it was highly unlikely that the jury would have been persuaded otherwise by his testimony. For example, Carter asked Cullins and Tiner if they lived alone or with a roommate. Carter told Tiner he instructed Cullins not to tell Tiner that he was in town. He arrived at Tiner's house despite Tiner's testimony that she had never given him her address. Carter withdrew $60 from Cullins' bank account, leaving a nearly $0 balance. Carter's numerous crimes were performed throughout northern, central, and southern California over twenty-three days, and he made it to Arizona before he was arrested. The California Supreme Court could reasonably have concluded that even if Carter had testified he blacked out during each crime, there is no reasonable probability the jury would have acquitted him.

Carter concedes "the prosecution's case was strong" on this point. To show the result may have been different, he points to a juror declaration that the jury vote was mixed for guilty and not guilty when deliberations started. He also highlights how the jury took nearly five days to reach a guilty verdict.

Although the length of deliberation can be an objective sign that the jury struggled with the verdict, all of the cases Carter cites to this effect are distinguishable. They all involve cases where the length of deliberation was disproportionate to the length of the trial, or cases where there was only one charge for the jury to deliberate. *See Thomas v. Chappell*, 678 F.3d 1086, 1103 (9th Cir. 2012) ("The jury deliberated for almost five full days, even though it heard argument and evidence for only about six days."); *Daniels v. Woodford*, 428 F.3d 1181, 1193 (9th Cir. 2005) ("After two days of deliberations, the jury returned a verdict imposing death [based on one murder]."); *Dyas v. Poole*, 317 F.3d 934, 936 (9th Cir. 2003) (per curiam) ("[T]he jury took 3-1/2 days to deliberate following Dyas's 5-day trial [on only one murder and robbery]."). Here, on the other hand, the trial lasted multiple weeks but the jury deliberated only between 3 1/2 and 4 days, and had over a dozen issues to decide, including three murders, two rapes, two residential burglaries, and concurrent findings (including whether the murders were in the course of rape and burglary). The length of deliberation here is not so persuasive a sign that the jury struggled with the verdict, and the California Supreme Court could reasonably have concluded that it did not create a reasonable probability that the result would have been different had Carter testified.

B. *Claims Certified by the Southern District*

The Southern District issued a COA for two separate claims. We discuss each in turn and conclude that Carter was not deprived of constitutionally adequate representation.

    1. Certified Claim 1 (Claim 3 of Second Amended Petition): Ineffective Assistance of Counsel at Penalty Phase

In the first claim certified for our review, Carter alleged that his trial counsel "failed to provide reasonably competent assistance at the penalty phase of his trial," and if not for counsel's "unprofessional actions and omissions," the sentence imposed would have been different. Carter raised five specific arguments about his counsel's performance: (1) they "failed to adequately investigate mitigating and aggravating evidence"; (2) they employed the same penalty phase strategy that had been used in the Los Angeles trial, a strategy that had resulted in a death verdict; (3) they were "ineffective in developing and presenting Carter's background to the jury"; (4) they failed to develop evidence of Carter's mental impairments; and (5) they were "deficient in penalty phase closing arguments." The district court rejected each of these arguments.

On appeal, Carter asks us to find constitutional deficiency in the San Diego counsel's strategy of focusing on the positive aspects of his career and family life as an adult, rather than giving greater emphasis to his traumatic childhood and mental illness. He attributes counsel's decision to pursue this strategy—despite having seen it fail during his Los Angeles trial—to their failure to conduct a satisfactory investigation of his childhood in Nome. Had counsel's

investigation been sufficient, he alleges, they would have instead called additional witnesses who knew of his childhood in Nome, and would have elicited more testimony from the twenty-one witnesses whom they did call about particular forms of abuse Carter had suffered, including that his parents chained him up at home and locked him in a makeshift jail cell. Additionally, Carter charges that counsel did not fully investigate the extent of his mother's alcohol consumption during his gestation and alleges that a sufficient investigation would have compelled counsel to present evidence that Carter suffered from fetal alcohol syndrome (FAS).

### a.   Prior Rulings

Carter did not allege ineffective assistance of counsel during the penalty phase of trial on direct appeal to the California Supreme Court. He raised this claim for the first time in his state habeas petitions, which the California Supreme Court summarily denied. The state does not argue that this claim was procedurally defaulted, and we treat the state court's decision as a denial of relief on the merits. *Richter*, 562 U.S. at 99. Because there was no reasoned explanation accompanying this decision, Carter must show there was "no reasonable basis for the state court to deny relief." *Id.* at 98. Our task is to determine what arguments or theories could have supported the California Supreme Court's decision, and whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with a prior holding of the U.S. Supreme Court. *Id.* at 102. We conclude that Carter has failed to demonstrate that the California Supreme Court lacked a reasonable basis for denying relief.

## b. Performance in Investigating Carter's Background

Carter's first argument is that counsel performed deficiently in their investigation of his background in Nome. Under *Strickland*, "counsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary" during the penalty phase of a trial. *Strickland*, 466 U.S. at 691 (emphasis added); *see Wiggins v. Smith*, 539 U.S. 510, 526–28 (2003). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

Five years before trial, the state appointed Charles Ted Bumer to serve as Carter's lead trial counsel and Josephine Dedina to serve as co-counsel. Bumer and Dedina were assisted by paralegal Kathleen Gilberd and private investigators Marion Pasas and Chuck Hile. The trial team traveled to Alaska to gather evidence, and Pasas visited Carter's hometown of Nome to interview residents who had known the Carter family during his childhood.

Based on Pasas's investigation, during the penalty phase the defense team called six witnesses, out of a total of twenty-one, who knew Carter as a child in Nome. Each of the six witnesses testified about the relationship between Carter and his parents, and several also gave general testimony about the conditions Native Alaskans in Nome faced.

Carter's brother Jerry Carter (Jerry) testified that their mother Esther and stepfather Jim drank heavily, argued, and were often physically violent with one another. He also testified that Esther corporally punished the children with

branches, a belt, and a razor strap, and that Carter ran away, often for several days at a time. Jerry further testified to two instances of abuse from Carter's childhood: an incident where a five- or six-year-old Carter was dragged by the bumper of Esther's car while attempting to prevent her from going to a bar, and an incident where Jim and Esther chained Carter to his bed for a day or two to prevent him from running away. Jerry stated that sometime after these incidents, Jim and Esther sent Carter away to a home for unwanted children.

Carter's sister Polly Reaser (Polly) testified that Jim and Esther often drank in bars until 4:00 in the morning and were violent with one another, and that Carter would have witnessed these incidents of drunken violence.

Local elder Bertha Adsuna had lived in Nome for over fifty years at the time of trial. She testified that alcohol was a societal problem in the town, that Esther frequented the bars, that Carter spent much of his childhood alone, and that Esther dressed and treated Carter worse than she did Jerry. After Esther married Jim, Adsuna observed that the couple often went to bars together.

Harriet Brown served from 1947 to 1967 as a missionary pastor at a Nome church attended mostly by Alaska Natives and was Carter's childhood Sunday-school teacher for two to three years. She testified that the largest problem among the Native population was alcoholism. She also frequently saw child neglect in the community. Brown further testified that Jerry and Polly were always dressed well as children, but that Carter was not, and that Esther did not treat him nicely.

Beth Farley was a childhood classmate of Carter's. She testified that he was often alone, ignored by his family, and spent more time with the Farley family than his own. She also testified that she left Nome because of pervasive alcohol abuse, stating that even the children drank and many died of either exposure or suicide. Farley testified that her son was part Alaska Native and that she had witnessed and experienced prejudice against people of mixed race in Nome.

Ruth Butts was also a childhood classmate of Carter's. She testified that an incident had led many people to search for Carter as a child and that it was common knowledge that Jim was not the biological father of either of his stepsons, which led children to tease Carter and Jerry. She also testified to seeing Jim drunk in bars after church on Sundays.

Carter argues that this testimony was insufficiently compelling to the jury because his counsel had failed to further investigate his abusive childhood. A more complete investigation, he alleges, would have prompted counsel to call additional witnesses to the stand who could have testified to more specific instances of abuse.

Carter first points to counsel's failure to secure the testimony of his mother Esther. Pasas interviewed Esther in Nome, but Esther cut the interview short after Pasas asked a question about her alcohol consumption. After this aborted interview, Esther refused to provide any further assistance to her son's trial defense. However, in support of Carter's habeas petition, Esther submitted a sworn declaration stating that had she been "approached differently," she would have "talked to [counsel] and answered all of their questions" and "probably would have testified." Esther declared that her testimony would have included recollection of Jim using a

belt to discipline Carter, Jim chaining Carter to his bed, and she and Jim drinking heavily.

Carter also submitted several other declarations from Nome residents who were not called as defense witnesses during the penalty phase and who largely allege that they were not contacted or interviewed at the time of trial. As the district court noted, these declarations "largely outline, in greater detail than presented at trial, the mistreatment [Carter] suffered . . . at the hands of his mother and step-father and the alcoholism of his parents."

Most notably, Carter submitted a declaration from Arthur ("Guy") Martin, a colleague of Jim's on the Nome police force. Martin declared that when responding to a call from one of the Carter family's neighbors reporting child abuse, he had observed both Carter and Jerry chained to the floor of the family home. He suspected that Jim and Esther frequently chained the boys so that they could go out drinking. Martin declared that he had confronted Jim about the incident but that he had never reported it. Defense counsel had contacted and attempted to interview Martin prior to trial, but Martin had refused. Martin declared that he had declined to participate in the defense only because Esther had asked him not to speak to investigators or tell anyone about the abuse.

Additionally, Vaughn Johnson, a neighbor of the Carters, declared that he once saw Carter handcuffed and chained to the outside of his house, and that Carter had told Johnson that Jim had chained him. Cheryl Stavish, a childhood friend of Polly, declared that she recalled the same chaining incident, and had also observed a hidden room in the Carter home that resembled a jail cell, in which she "had a feeling" Carter was held.

Carter attributes Esther's refusal to testify to counsel's inadequate preparation of Pasas, and argues that a competent penalty defense would have featured his mother as the central witness. And had counsel not alienated Esther, Carter argues, Martin would have been willing to testify about the chaining incident he observed. He further argues that counsel was constitutionally deficient in failing to call both Johnson and Stavish, who would have corroborated each other's separate accounts of an incident of Carter being chained. Together, he argues, these witnesses could have established that Jim and Esther treated Carter more like a dog than a child.

The state argues that the testimony of Martin, Johnson, and Stavish would have been cumulative to that of Jerry, who testified that Carter had been chained to his bed for a day or two to prevent him from running away. We agree that much of their testimony would have been cumulative. But we disagree that their testimony would have been so entirely cumulative that it would certainly have been excluded as irrelevant. These three uncalled witnesses may reasonably have provided credible firsthand accounts of two additional instances in which Carter's parents chained him, supporting the inference that this was less an aberration than a routine practice. Had counsel's strategy been to present the young Carter as a metaphorical feral dog kenneled by his alcoholic parents, the eyewitness testimony of Martin, Johnson, and Stavish would have been relevant.

But that was never counsel's strategy. Rather than portray him as a feral child—a strategy which may have backfired by leading the jury to infer that the adult Carter was beyond rehabilitation—counsel's choice of witnesses during the penalty phase suggests that their intended narrative was one of Carter overcoming an abusive childhood home to find

personal and professional success before a divorce sent him spiraling into a life of violence. Indeed, the majority of witnesses counsel called gave testimony recounting how Carter had successfully rehabilitated himself as a young adult, allowing counsel to argue to the jury that Carter could again be capable of growth and redemption. The fifteen penalty-phase witnesses who came to know Carter after he left Nome included the house parent at the home for unwanted children Carter's parents sent him to, a youth counselor, a probation officer, a prison educator, and eleven professionals from the media industry who worked with Carter during his career as a television cameraman.

We cannot pass judgment on counsel's wisdom in choosing this narrative strategy over the one Carter argues they should have pursued. Rather, our duty is to determine what arguments or theories could have supported the state court's decision to deny Carter's claim that this strategic decision amounted to constitutionally deficient assistance, and whether fairminded jurists would disagree that those arguments or theories are inconsistent with a prior holding of the Supreme Court. *Richter*, 562 U.S. at 102.

The state court could have relied on *Strickland*'s "highly deferential" standard. *Id.* at 105. We "must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance" and presume that "under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "*Strickland* does not guarantee perfect representation, only a 'reasonably competent attorney.'" *Richter*, 562 U.S. at 110 (citation omitted). "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than

'sheer neglect.'" *Id.* at 109 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam)). Here, the state court may have reasonably determined that Carter's trial counsel made a legitimate tactical decision to present Carter's childhood trauma as they did rather than pursuing the child abuse angle more aggressively. It would have been able to support this determination with facts in the record: specifically, that counsel hired a professional investigator five years before trial began, that the investigator traveled to Carter's hometown and interviewed many people who knew him and his parents, and that counsel procured the testimony of twenty-one witnesses whose testimony formed a cohesive narrative of abuse, perseverance, success, and unraveling.

Carter argues that this theory conflicts with the holdings of two Supreme Court decisions, *Williams* and *Wiggins*, in which the Court granted habeas relief upon finding that counsel had been constitutionally deficient in its investigation of the petitioner's background. However, we are not persuaded that fairminded jurists would find that the holding of either case is in conflict with the *Strickland* analysis that could support the state court's denial of habeas relief.

In *Williams*, the Court granted relief where counsel failed to conduct an investigation into the defendant's "nightmarish childhood" because they incorrectly interpreted Virginia law to deny them access to records that were legally available to them. 529 U.S. at 395. Had Williams's counsel accessed all available records,

> the jury would have learned that Williams'
> parents had been imprisoned for the criminal
> neglect of Williams and his siblings, that
> Williams had been severely and repeatedly

beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

*Id.* (footnote omitted). Carter argues that the facts of his childhood compare strongly to those of *Williams*.

We disagree. The holding of *Williams* is that counsel renders constitutionally ineffective assistance if it fails to investigate and pursue a reasonable defense because it incompetently interpreted the law. *Id.* Here, Carter makes no argument that his counsel misinterpreted Alaska law in a way that caused them to bypass an investigation of available records. More importantly, nothing in *Williams* tells us that counsel is incompetent unless it pursues a defense based entirely on the defendant's neglect as a child. After an extensive investigation of Carter's background, counsel implemented a sound defense strategy: to show that Carter had suffered under abusive, negligent parents but had risen above this poor upbringing. This contrasts with *Williams*, where the "weight of defense counsel's closing . . . was devoted to explaining that it was difficult to find a reason why the jury should spare Williams' life." *Id.* at 369. Thus, *Williams* does not provide any relevant point of "clearly established Federal law," 28 U.S.C. § 2254(d), on which a fairminded jurist could find disagreement with the theories supporting the California Supreme Court's decision. *Richter*, 562 U.S. at 102.

In *Wiggins*, trial counsel conducted no investigation into the defendant's background beyond reviewing a Presentence Investigation Report and social services records. 539 U.S. at 523. Counsel did not take advantage of public defense funds for commissioning a forensic social worker, which the record indicated was standard practice in the Maryland legal community at the time of the trial. *Id.* at 524. Further, counsel did not follow up on any of the red flags apparent in Wiggins's social services records, including his mother's history of alcoholism and child neglect. *Id.* at 525. Again, Carter analogizes his case to the underlying facts of *Wiggins*. However, the Sixth Amendment violations that the Court clearly identified in *Wiggins* were counsel's failure to take advantage of funds to commission a social worker and their failure to take any action upon discovering red flags indicating that Wiggins may have experienced child abuse. Carter does not plausibly allege that counsel failed to follow up on reports that Carter was abused as a child. In fact, counsel traveled to Alaska, hired a professional investigator to interview his relatives and neighbors, and put six of them on the witness stand to testify about his abusive childhood, his parents' alcoholism, and the conditions of discrimination he faced as an Alaska Native. Carter's counsel, unlike Wiggins's counsel, thus competently followed up on their investigation into Carter's social history. *Wiggins*, like *Williams*, provides no support for Carter's habeas claim.

Likewise, Carter cites no relevant support for his argument that counsel performed deficiently by failing to procure the testimony of Esther or Martin. We are aware of no Supreme Court case requiring counsel to secure the cooperation of reluctant witnesses. And for good reason. A witness asked to testify in support of a friend or family member convicted of capital murder faces an intensely

difficult, personal decision that belongs to the witness alone, and counsel's duty cannot reasonably be extended to compel a witness to participate in the defense. Carter's counsel had a duty to "make reasonable investigations," *Strickland*, 466 U.S. at 691, which the state court could have found that counsel satisfied by interviewing Esther and attempting to interview Martin.

Carter also argues that counsel's choice of strategy was constitutionally deficient because his Los Angeles County trial counsel had employed a similar narrative, without success, during the penalty phase of those proceedings. That begs the questions of whether there was another approach that was clearly more likely to have produced a better outcome. Counsel in this case was dealt a difficult hand. We have not been persuaded that there was an alterative argument so attractive that the failure of counsel to take that other path amounted to ineffective assistance.

Moreover, the state court's rejection of this argument could reasonably be supported by *Strickland*. There, the Court held that courts should not conclude that a "particular act or omission of counsel was unreasonable" merely because it "proved unsuccessful." *Id.* at 689. Rather, it must presume that counsel's decision fell "within the wide range of reasonable professional assistance." *Id.* In this light, because we presume both the Los Angeles and San Diego attorneys were professionally competent, the fact that both teams decided to pursue the same strategy after considering all the evidence they had available to them only supports the state court's position that neither defense team was unreasonable in its choice. Because Carter cites no Supreme Court holding that fairminded jurists could disagree was consistent with this plausible theory, this argument also fails.

c.  Performance in Investigating Carter's Mental
    Health

Carter argues that counsel failed to conduct an adequate
investigation into his mental health, including the possibility
that he suffered from FAS.  But as we have explained,
"counsel's decision not to pursue a mental health defense is
a reasonable strategic decision under *Strickland* " when
"adopting a mental health defense would open the door to
[unfavorable] rebuttal testimony." *Atwood v. Ryan*, 870 F.3d
1033, 1063 (9th Cir. 2017).

Here, the record indicates that, at counsel's request, a
Dr. Lottenberg performed a PET scan of Carter's brain
approximately one week before the penalty phase of trial
began.  Counsel consulted with several experts, who
recommended that the results be sent to Dr. Monte
Buchsbaum for analysis.  The court held an in-chambers
teleconference with counsel and Dr. Buchsbaum, during
which Dr. Buchsbaum identified an unusually high number of
abnormalities in Carter's brain.  He then stated that he would
need additional information to render a more detailed and
substantive opinion about Carter.  After this hearing, Carter's
counsel spoke to Dr. Buchsbaum alone and off the record.
Counsel then informed the court that it had made a "tactical
decision" not to introduce evidence of Carter's mental health
during the penalty phase.  Judge Lasater noted on the record
her agreement with counsel's decision because
Dr. Buchsbaum's testimony would have opened the door to
rebuttal evidence of Carter's mental health from the state.

The trial record contains several mental health reports
unfavorable to Carter that the state could have introduced
during the penalty phase if the door had been opened.  A

1973 psychological evaluation found Carter to be a "fairly classical sociopathic personality." A probation report from the same year noted that Carter's personality gave him "little chance at ever making acceptable social adjustment." A 1975 psychiatrist's evaluation found that, by Carter's own admission, "his irritability and destructively aggressive conduct that emanates from it are willful, the result of personal choice, and represent matters over which he could exercise control if he chose to do so." A 1977 psychological evaluation found that Carter "tended to see things in a concrete way with little insight." A 1977 Alaska pre-sentence report described Carter's behavior as "best explained [by] focusing on his immaturity and lack of consideration of consequences." And a 1978 evaluation found that Carter had some indicia of psychiatric problems but did not need mental health assistance at the time, and described his behavior as "self-punitive in that he feels guilt for his misbehavior, but is not deterred by the guilt."

We agree with both the trial judge's observation and the district court's conclusion that Carter's counsel would have opened the door to introduction of this potentially damaging evidence by putting forth a mental health defense at trial. Notably, the district court was careful to emphasize that "this is not a case in which counsel failed to conduct *any* mental health investigation." Carter's counsel ordered a PET scan of Carter's brain, conferred with an appropriate expert recommended by multiple other experts in the field, and made a tactical decision not to present mental health evidence at trial. *Strickland* directs us to presume that the challenged actions of counsel were "sound trial strategy," 466 U.S. at 689, a presumption that is here supported by the aggravating mental health evidence that would have been made relevant for rebuttal purposes by Dr. Buchsbaum's

testimony.[7]   Thus, we may conclude that the state court properly denied relief under *Strickland*'s deferential standard.

Carter also argues that counsel was deficient in failing to investigate and present evidence that he suffered from FAS, averring that competent attorneys would have pursued this avenue after learning that Esther consumed alcohol while pregnant.   However, there is no evidence in the trial record that would have put Carter's counsel on notice that Esther drank while pregnant.   Carter cites counsel's interviews with Jerry and Adsuna, but these interviews only reference Esther's drinking in her later years, after she gave birth to her children.   Further, this argument fails for the tactical reasons described above, as any argument by counsel that Carter's actions could be attributable to FAS would have opened the door to the potentially damaging rebuttal evidence contained in the record.

In sum, Carter has succeeded only in establishing that counsel may have chosen to pursue other strategies during the penalty phase of his trial.   He has failed to establish that counsel's investigation was deficient.   Rather, our review of the state trial record shows that counsel acted with diligence beginning five years before trial to investigate events that took place thirty years prior in a remote town thousands of

---

[7] Indeed, we granted habeas relief on an ineffective assistance claim—albeit in a pre-AEDPA case—where trial defense counsel presented an expert mental health witness whose testimony suggested that the defendant "may be a sociopath." *Daniels v. Woodford*, 428 F.3d 1181, 1210 (9th Cir. 2005).   Here, even if Dr. Buchsbaum's testimony had been sympathetic to Carter, it may have directly led to the introduction of the 1973 psychological evaluation finding Carter to be a "fairly classic sociopathic personality."   We have no basis for second-guessing counsel's tactical decision not to pursue this line of defense.

miles away, and counsel succeeded in contacting a significant number of Carter's relatives, friends, neighbors, co-workers, and correctional counselors. Counsel elicited trial testimony from twenty-one of these individuals which tended to show that Carter had been severely abused as a child but had, as an adult, shown the capacity to be rehabilitated and function as a productive member of society. Counsel also conducted a PET scan of Carter's brain, but after conferring with a recognized expert, decided that the sum of the mental health evidence would be more aggravating than mitigating. On this record, Carter has failed to establish that the California Supreme Court was unreasonable in denying his ineffective assistance of counsel claim.

2. Certified Claim 2 (Claim 4 of Second Amended Petition): Denial of Psychiatric Expert Assistance at Trial

In the second claim certified by the Southern District for our review, Carter alleged that "he was deprived of the right to competent assistance of a psychiatric expert," that "counsel had an obligation to properly prepare the experts" who evaluated him, and that their failure to do so constituted ineffective assistance. Carter raised this claim in his first state habeas petition, which the California Supreme Court summarily denied. We treat that decision as a denial on the merits. *Richter*, 562 U.S. at 99. Because the decision was not accompanied by a reasoned explanation, Carter has the burden to show that "there was no reasonable basis for the state court to deny relief." *Id.* at 98. Again, our task is to determine what arguments or theories could have supported the California Supreme Court's decision, and "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent" with a prior holding

of the U.S. Supreme Court. *Id.* at 102. We conclude that no such inconsistency exists here.

Carter bifurcated this claim into a charge that his attorneys failed to render effective assistance in preparing expert psychiatric witnesses, and a charge that his experts themselves rendered ineffective assistance. The district court construed the portion of the claim charging counsel as ineffective as a mere repetition of the prior certified claim regarding a FAS defense. We agree, and hold that Carter is not entitled to relief for the reasons stated immediately above.

Carter argues that the state court's denial of relief on his claim that his expert witnesses were ineffective is in tension with the Supreme Court's holding in *Ake v. Oklahoma*, 470 U.S. 68 (1985). There, a state-supplied psychiatrist repeatedly evaluated a mentally ill murder defendant before trial, first deeming him not competent to stand trial but later deeming him competent. *Id.* at 70–72. During trial, defense counsel requested that the indigent defendant be provided with a psychiatrist to examine him "with respect to his mental condition at the time of the offense." *Id.* at 72. The state trial judge denied the request. *Id.* The Supreme Court granted certiorari on direct appeal and held that "the participation of a psychiatrist is important enough to preparation of a defense" that the Due Process Clause of the Fourteenth Amendment may require a state to provide an indigent defendant with psychiatric assistance under certain circumstances. *Id.* at 77.

At no point did the Court in *Ake* place any obligation on *defense counsel* to present psychiatric evidence at trial. Rather, that case's holding is limited to imposing an obligation on states to make a psychiatrist available to a

murder defendant upon the satisfaction of the balancing test. An *Ake* claim is *not* a Sixth Amendment ineffective assistance of counsel claim, but rather a Fourteenth Amendment due process claim against the state. *Id.* at 76 ("This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle [is] grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness . . . .").

We conclude that Carter has failed to establish that *Ake* or any other Supreme Court decision would cause jurists of reason to disagree with the reasonable arguments in support of the state court's decision. Carter conceded in his brief that the Supreme Court has never interpreted *Ake* to guarantee a due process right to effective expert assistance at trial. Rather, the Court has never extended the state's obligation beyond providing a psychiatric expert to an indigent defendant, and Carter does not dispute that he had access to such an expert. Because we may rely only on the holdings of the Supreme Court in evaluating whether the state court's decision was reasonable, *Williams*, 529 U.S. at 412, our analysis ends here. We do not address Carter's arguments that rely on "circuit precedent," which "cannot form the basis for habeas relief under AEDPA." *Parker*, 567 U.S. at 48–49.

## IV. UNCERTIFIED CLAIMS

Carter also raised several arguments relating to claims that the district courts did not certify in a COA. As a state prisoner seeking relief under § 2254, Carter has "no automatic right to appeal" the denial or dismissal of his

petition. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). We lack jurisdiction to review a district court's denial of a habeas claim "aris[ing] out of process issued by a State court" until and unless a federal court has issued a COA. 28 U.S.C. § 2253(c)(1)(A); *Miller-El*, 537 U.S. at 336. We accordingly construe Carter's arguments on these uncertified claims as a motion to expand the COA. *See* 9th Cir. R. 22-1(e).

"A certificate of appealability may issue [in federal habeas review of state proceedings] only if the applicant has made a *substantial* showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (emphasis added); *see Wilson v. Belleque*, 554 F.3d 816, 825–26 (9th Cir. 2009). This statutory requirement "serves a gatekeeping function." *Payton v. Davis*, 906 F.3d 812, 818 (9th Cir. 2018). In enacting § 2253, "Congress confirmed the necessity and the requirement of differential treatment for those appeals deserving of attention from those that plainly do not." *Miller-El*, 537 U.S. at 337. "It follows that issuance of a COA must not be *pro forma* or a matter of course." *Id.*

Nevertheless, the "standard for obtaining a COA is not a particularly exacting one." *Wilson*, 554 F.3d at 826. "[A] court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief." *Miller-El*, 537 U.S. at 337. Rather, "[a]t the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (quoting *Miller-El*, 537 U.S. at 327). But when a district court "denies a habeas petition on procedural grounds without reaching the

prisoner's underlying constitutional claim," a COA can issue only if the prisoner shows that (1) "jurists of reason would find it debatable whether the district court was correct in its procedural ruling," and (2) "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

We ordered supplemental briefing on several of the uncertified claims. Given the low bar for issuing a COA, *see Miller-El*, 537 U.S. at 338, for the reasons discussed below, we issue a COA on one claim not certified by the Central District that alleged ineffective assistance of counsel at the penalty phase. Although we issue a COA, we affirm the denial of habeas relief on this claim because the California Supreme Court's determination that counsel satisfied *Strickland*'s deferential standard is not contrary to or an unreasonable application of federal law. *Richter*, 562 U.S. at 105.

A. *Claim 6 of the Central District Habeas Petition: Ineffective Assistance of Counsel at the Penalty Phase*

Similar to the claim certified by the Southern District that Carter's counsel was ineffective during the penalty phase, claim six in Carter's Central District habeas petition argued that if his attorneys had conducted more than an "initial attempt" at an investigation, they would have uncovered more evidence of child abuse and brain damage. Presentation of this additional evidence, he contends, would have changed the result at the penalty phase. We, however, can find no grounds for believing that the California Supreme Court unreasonably denied relief given the record of counsels' collective efforts.

1.   Mitigation Evidence Presented at Penalty Phase

Counsel called twenty-one witnesses to present mitigating evidence.  Carter's siblings, Jerry and Polly, testified that their parents were alcoholics who often came home late after drinking with "extreme arguing" that included hitting, throwing furniture, and throwing each other.  Their mother also sometimes "g[o]t carried away" administering discipline with the children.  Although Jerry denied that Carter was treated "that much worse" than Jerry, other Nome residents testified that Jerry was treated better than Carter.  One neighbor even testified that Carter was "more like an orphan" when the boys were young.

Set against this background, the jury heard about dramatic instances of abuse and Carter's unusual family life.  They heard about a time when Carter was seven or eight that their mother came home around 2:00 a.m. but started to leave again to pick up their father, and Carter tried to get her to stay home by "t[aking] off running after the car," "holler[ing] at [her] to stop," and "h[anging] on to the bumper and tried to stop the car for quite a ways," being dragged over a gravel road.  They heard that Carter's father chained him to a bed at least once when he was only eight or nine years old.

The jury heard that in the midst of all this misery, Carter often ran away for several days at a time, including once to Anchorage by plane.  Around age eight or nine, Carter's parents sent him to the Jessie Lee Home, far from Nome, which Carter's sister Polly described as "a jail or something for children."  Even when the family traveled near the Home, they did not stop to visit him, which "shocked" Polly.

On appeal, post-conviction counsel submitted declarations tending to show that Carter being held in chains was not a one-time event. Childhood friends, classmates, and adults wrote in post-conviction declarations that they saw Carter handcuffed and chained to Carter's cabin, or held in a makeshift jail cell. One police officer who investigated allegations of abuse at the Carter house said he saw Carter, and possibly Jerry, chained to the floor with a bowl of water next to them. Counsel also asserted that Carter suffered from organic brain damage and Fetal Alcohol Syndrome at the time of the crimes, and that evidence to that effect should have been presented.

### 2. Ineffective Assistance of Counsel

Carter argues that trial counsel were ineffective because they failed to investigate and present more mitigating evidence regarding child abuse and possible brain damage. Since there is no state-court reasoned decision on this issue, Carter must show that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. He cannot.

#### a. Performance

First, the California Supreme Court could reasonably have concluded that counsel did not perform deficiently because their presentation was based on strategic choices after a reasonable investigation. A defense attorney has a duty to make reasonable investigations that enable informed decisions about how best to represent the client. *Strickland*, 466 U.S. at 691; *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994). But "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland*, 466 U.S. at

689—"doubly so" when § 2254(d) is also involved, *Richter*, 562 U.S. at 105.  Carter has the burden to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.

Gillingham testified in a post-conviction declaration that his performance at sentencing could have been better in various ways:

- He was "unable to build rapport or develop [Carter's] confidence," which "contributed to [his] inability [to] present a compelling case in mitigation;"

- He was unable to secure Carter's mother's cooperation, as "she was not willing to discuss her life, petitioner's birth father, circumstances surrounding his birth, his childhood, or any other subject related to her family;"

- He "failed and omitted to prepare a social historian or cultural anthropologist" or "a psychiatrist, psychologist or other mental health professional," even though he believed Carter's "childhood and adolescence were neglectful and alienating, and [was] aware of his long-term drug and alcohol abuse;"

- Although he "suspected the possibility of organic brain damage," and a mental health professional he consulted suggested an MRI, he did not request an MRI or PET scan; and

- He generally "was unable to formulate any coherent strategy or plan to defend petitioner in guilt or penalty phases of trial."

As the district court explained, however, Gillingham falling on his sword "in retrospect" is "not dispositive." Rather, to fairly assess attorney performance, a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. Viewed in that light, and especially given that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," the California Supreme Court could reasonably have concluded that Gillingham's team did not perform deficiently. *See id.*

Carter's attorneys went to great lengths to investigate Carter's troubled childhood. Both Gillingham and Morrissey traveled to Nome to interview family members and other residents, and their investigator Casey Cohen made four separate trips to Alaska and spoke with about forty different people. Cohen tried very hard to speak with Carter's mother because he considered her "a very important" "primary witness to his early childhood." Although he spoke to her "at least three times" in person, and "probably several times by phone," Carter's mother refused to cooperate, including by telling others not to communicate with Cohen.

While acknowledging the "resistance" his defense team faced from "unhelpful" Nome residents, Carter claims that if his counsel had done more than "an initial attempt" at an investigation, they would have gotten more people to testify and presented a fuller picture of the extent of the abuse Carter

suffered as a child. But the problem is not that Carter's counsel made only an "initial attempt" at an investigation, but rather that they diligently followed leads and were met with dead ends. *Cf. Wiggins*, 539 U.S. at 523–25 (finding counsel unreasonably abandoned their investigation even though records in their possession put them on notice of possible child abuse). For example, although Cohen "pressed her hard to be honest with" investigators, Edna Buffas, whose father worked with Jim Carter and had "always" known the Carters, repeatedly called Dean "happy-go-lucky" and said "she couldn't think of anything that might have improved the Carter family."

Any "failure to investigate thoroughly" here resulted not "from inattention," but from thwarted attempts. *See Wiggins*, 539 U.S. at 526. Attorneys are expected to formulate reasonable strategies that "balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107. Thus when they hit dead ends like this, they may abandon those inquiries, especially if they determine they are "distractive from more important duties." *Id.* (quoting *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (per curiam)).

Moreover, Carter's arguments downplay his own role in what he claims to be a stunted investigation. *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."). Indeed, there was evidence that Carter himself told Polly and Jerry not to talk to defense investigators. As another example, Carter argued that "if Gillingham and Carter did not have a conflict, then Carter could have encouraged his mother and siblings to cooperate with trial counsel, which then would have led to a more fruitful mitigation investigation." But if this alleged

conflict prevented his mother and siblings from cooperating in a way that Carter should benefit from, he has not explained how. Moreover, Carter himself could have given the defense team the details he claims people could have provided. *See id.* ("[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether."). The California Supreme Court could reasonably have determined that the investigation was not inadequate.

Carter also argues that it was "unreasonable" for trial counsel to decide "to focus their investigative efforts on developing evidence about Carter's moderately successful life as an adult." But Carter has not "overcome the presumption that, under the circumstances," counsel's investigation and presentation "might be considered sound trial strategy" developed after a thorough investigation. *Id.* at 689–91(citation omitted). Indeed, there is evidence that this is so. In a memo written after interviewing Jerry Carter, Cohen wrote, "As the interview progressed we felt that there was no history of child abuse so significant that it would tie in with a general theory as-to why Dean ends up murdering anyone." He expanded,

> [A] penalty phase defense would be focused as follows: To use Jerry only to tell the good about Dean and to plead with the jury to spare his life. To not try and construct a theory around any kind of child abuse. To lay out Dean's life as it occurred. To recount how he perceived some problem deeply enough to try and run away from home from age 7 onward. To tell how he got into trouble, went to

> institutions, and eventually grew up. Then, as
> an adult he rehabilitates himself, gets a good
> job, marries, and settles down. But problems
> in the marriage develop.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689.

Carter again relies heavily on *Wiggins*, 539 U.S. 510. But in *Wiggins*, defense counsel failed to present *any* evidence of the defendant's life history, justifying this as "a tactical judgment not to present mitigating evidence at sentencing" and instead dispute Wiggins' direct responsibility for the murder. 539 U.S. at 521. Here, the jury heard much about the abuse, including how Carter was treated worse than Jerry, chained at least once, and ran away multiple times because of the misery. As the district court reasoned, the California Supreme Court may reasonably have concluded that trial counsel decided not to present this evidence because (a) the jury would not have responded well to the insinuation that a child abused this badly would inevitably go on to rape, kill, and burglarize multiple women; (b) that the evidence of Fetal Alcohol Syndrome or brain damage would not have been well received because of the evidence that Carter acted so rationally over such a long period of time; and (c) that the evidence largely duplicated what they already presented.

For example, declarations from Vaughn Johnson, Chuck Reader, and Cheryl Stavish that Carter was chained—which may or may not have been describing the same incident—are

compelling, but the jury knew that Carter was chained as a child. Moreover, some of the evidence Carter faults his counsel for not presenting contradicted other evidence presented. For example, Jerry testified he himself was never chained, so the Officer's possible testimony saying that Jerry might have been chained would have been less helpful. Jerry also denied that Carter was treated "that much worse" than he was, so the value of additional evidence regarding the disparity between the two was minimal.

Additionally, as the government points out, many of the declarations Carter now submits rest on hearsay. For example, Cheryl Stavish testified that *Polly told her* that she used to hear Carter's father beating or whipping him; Officer Martin stated that *Sophie Swanson told him* the boys were chained every time the Carter parents went out to drink, which was frequently; and Chuck Reader declared that *Ivan Johnson told him* Carter was chained and locked up "almost all of the time." Moreover, some witnesses are less than confident in their claims. For example, Michael Ashmasuk testified that he and his friends "*assumed* Jim Carter had locked [Carter] in the closet," (emphasis added); Officer Martin stated that he "found Dean and Jerry Carter chained to the floor," but clarified that he "could see the chain on Dean, but [did not] remember seeing the chain on Jerry." The state court could reasonably have concluded that the investigation was sufficient.

The question here is not whether Carter's attorneys should have introduced more mitigating evidence, but rather whether the investigation supporting counsel's decision not to introduce more mitigating evidence was reasonable. *See id.* at 523. The California Supreme Court may reasonably have

concluded that the answer to that question was yes, that counsel's decision was reasonable.

### b. Prejudice

Even if Carter's defense team performed deficiently, the California Supreme Court could reasonably have concluded that Carter was not prejudiced by their performance. To show prejudice, Carter must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. But here, there was no reasonable probability that the outcome would have been different if a jury had heard more evidence about the extent of the abuse Carter suffered, especially given the hearsay, contradictory, and weak nature of the additional evidence. *Id.* at 694.

A death verdict with overwhelming record support is less likely to have been affected by errors than one only weakly supported by the record. *Id.* at 696. As the California Supreme Court noted and Carter concedes, there was "strong evidence directly linking defendant to the charged murders." *Carter*, 117 P.3d at 527.

## B.  *Remaining Uncertified Claims*

We conclude that no jurist of reason would find it debatable that any of Carter's remaining uncertified claims states the denial of a constitutional right. *See Wilson*, 554 F.3d at 826. We therefore deny a COA as to the rest of the claims not certified by the Southern and Central District Courts.

## V.  CONCLUSION

For the foregoing reasons, in Case No. 13-99003, the judgment of the United States District Court for the Central District of California is **AFFIRMED**.

For the foregoing reasons, in Case No. 13-99007, the judgment of the United States District Court for the Southern District of California is **AFFIRMED**.

Carter's supplemental motion to expand the certificate of appealability, filed October 6, 2015, is **GRANTED** as to Claim 6 in Case No. 13-99003, and otherwise **DENIED**.